UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

CHAMBERS OF
MICHAEL A. SHIPP
UNITED STATES DISTRICT JUDGE

CLARKSON S. FISHER FEDERAL BUILDING
& U.S. COURTHOUSE
402 EAST STATE STREET
TRENTON, N.J. 08608
609-989-2009

**NOT FOR PUBLICATION**

January 13, 2020

**LETTER OPINION & ORDER**

**VIA CM/ECF**
All counsel of record

    Re:   *United States v. Santos, et al.*, No. 18-585

Dear Counsel:

This matter comes before the Court upon Defendant Victor Santos's ("Santos") Omnibus Motion (ECF No. 114) and Defendant Fausto Simoes's ("Simoes") Motions for a Bill of Particulars (ECF No. 110), for Release of *Brady* Materials (ECF No. 111), to Sever the Trial (ECF No. 112), and to Dismiss the Indictment (ECF No. 113). The Government opposed Santos's and Simoes's (collectively, "Defendants") Motions. (ECF No. 120.) Replies were filed by Santos (ECF No. 126) and Simoes (ECF No. 125).

The Court has carefully considered the parties' submissions and heard oral argument on December 19, 2019. For the reasons set forth below, the Court denies Santos's Motion and denies Simoes's Motions.

**I.    Santos's Motion to Dismiss the Indictment Due to Delay**

Santos moves to dismiss the Indictment on the basis of delay by the Government. "Within the statute of limitations period, a court may dismiss an indictment for pre-accusation delay if it finds the delay to be so oppressive that it violates the Due Process Clause of the Fifth Amendment." *United States v. Baxt*, 74 F. Supp. 2d 425, 429 (D.N.J. 1999). A defendant can establish a violation where: "(1) the Government intentionally delayed bringing the indictment in order to gain some tactical advantage over him; and (2) this delay caused the defendant to suffer actual prejudice." *Id.*; *see United States v. Beckett*, 208 F.3d 140, 150–51 (3d Cir. 2000).

    **A.    Intentional Delay to Gain Tactical Advantage or to Harass**

The Court will first address whether Santos has shown the Government deliberately delayed bringing the Indictment to obtain a tactical advantage or to harass him. "[P]rosecutors enjoy broad discretion in determining when to seek an indictment[,] and . . . this discretion empowers prosecutors to delay obtaining an indictment for investigative purposes. Consequently, prosecutors

have the discretion to delay an indictment even after they have assembled sufficient evidence to prove guilt beyond a reasonable doubt." *Baxt*, 74 F. Supp. 2d at 429 (citation omitted). Therefore, it must be shown "that the government deliberately delayed bringing the indictment in order to obtain an improper tactical advantage or to harass [the defendant]." *United States v. Diallo*, 732 F. App'x 94, 99–100 (3d Cir. 2018). This requires a "showing of prosecutorial bad faith." *Baxt*, 74 F. Supp. 2d at 430.

At oral argument, Santos conceded there is no evidence of intentional prosecutorial bad faith. (Dec. 19, 2019 Rough Uncertified Tr. ("Tr.") 5:21–23 ("[O]n the existing record, we cannot show that the [G]overnment intentionally delayed in order to gain a tactical advantage. That is not our argument, we don't have evidence that they did that.").) Instead, Santos argues that intentional delay is demonstrated by the Government's inability to provide a legitimate justification for its preindictment delay.[1]

Santos argues there were instances of the Government's delay that are inexplicable and in "reckless disregard of the prejudice that would flow to the defendants['] ability to mount an effective defense." (Santos's Moving Br. 7.) Santos points to the following delays: (1) the four and one-half years between the October 2008 recordings and the Government's final transcription and translation of those recordings; (2) the three and one-half years between the Government filing a complaint against Sidnei Chimanski and its filing a complaint against Defendants; (3) the two years between Chimanski entering a plea and the Government's filing a complaint against Defendants; and (4) the nearly one-year period between the complaint against Defendants and the Indictment against Defendants.

The Government offers several justifications for the delays in its investigation and ultimate filing of the Complaint and Indictment. First, the Government states that because Defendants were suspected flight risks, the Government proceeded cautiously and deliberately in its investigation to avoid alerting Defendants. (Yoakim Aff. ¶¶ 15–18, ECF No. 120-8.) Second, the FBI Mortgage Fraud Task Force investigating Defendants was deluged with reports of mortgage fraud in the wake of the Great Recession, which contributed to caseload pressures and delay. (*Id.* ¶¶ 19–20.) Third, the investigation required numerous subpoenas, extensive review of financial and mortgage loan documents, many interviews, and time-consuming investigation into separating Defendants' legitimate business activity from fraudulent activity. (*Id.* ¶¶ 21–24; Edds Aff. ¶ 3, ECF No. 120-9.)

---

[1] Santos and the Government dispute whether intentional delay may be "inferred from the Government's inability to provide a legitimate justification for the delay at issue, particularly where its actions show a reckless disregard of the risk that delay in bringing the indictment would impair the defendant's ability to mount an effective defense." (Santos's Moving Br. 5, ECF No. 114-1.) Santos cites precedent where prosecutorial bad faith was inferred where the Government delayed with reckless disregard of the risk of prejudice without a legitimate justification. *See, e.g., United States v. Benjamin*, 816 F. Supp. 373 (D.V.I. 1993); *United States v. Harmon*, 379 F. Supp. 1349, (D.N.J. 1974). The Court accepts for the purposes of this motion that bad faith may be shown by inference where there is reckless disregard of a risk of prejudice and lack of legitimate justification, but also recognizes that "a heavy caseload and multiple reassignments of a case among prosecutors have been accepted as legitimate justifications for preindictment delay." *Baxt*, 74 F. Supp. 2d at 432.

Fourth, the investigation was assigned and reassigned to three different prosecutors, which contributed to the delay. (Yoakim Aff. ¶ 26.) Fifth, the Government's delays in transcribing and translating the October 2008 recordings were not in bad faith because the investigation was assisted by a participant on the recordings who also assisted in translating the recordings—so translations were not as essential—and the participant pointed out errors in the first translation, which necessitated another round of time-consuming translation. (*Id.* at ¶¶ 10–14.) Sixth, the delay in transcribing and translating the recording was not four and one-half years, as Santos contends, because transcription and translation of the October 2008 recordings were first ordered in November 2009. (*Id.* at ¶ 13.) And seventh, the Government's delay between filing the complaint against Defendants and the instant Indictment is largely attributable to Defendants' repeated continuance requests. (Government Omnibus Opp'n Br. at 4 n.4; *see* ECF Nos. 31, 33, 34, 36, 40, 42, 45, 47, 48, 49, 53, 56, 61, 62.)

Here, the Court finds that Santos fails to show that the Government deliberately delayed in the course of its investigation to obtain an improper advantage or to harass him. Although Santos demonstrates delays in the investigation and filing of the complaint, the Government's offered justifications for the preindictment delays are legitimate justifications for the delays and sufficient grounds to rebut allegations of prosecutorial bad faith. Cases cited by Santos where intentional delay was inferred by a lack of legitimate justification are distinguishable. *See, e.g.*, *Benjamin*, 816 F. Supp. at 147 (finding intentional delay where the Government, without justification, failed to obtain evidence the defendant indicated was exculpatory); *Harmon*, 379 F. Supp. at 1350–52 (finding intentional delay where the Government offered no explanation for the delay).

### B. Prejudice

Although Santos's failure to show prosecutorial bad faith is enough to end the Court's inquiry, the Court will also state its findings on prejudice. For a defendant to show prejudice as a result of preindictment delay, it is not enough to speculate on the "possibility of prejudice inherent in any extended delay," such as the loss of memories, loss of witnesses, or loss of evidence. *United States v. Marion*, 404 U.S. 307, 326 (1971). Instead, "the defendant must demonstrate, with specificity, that the delay resulted in the loss of exculpatory evidence, whether testimonial or documentary, that is not merely cumulative of evidence available from other sources." *Baxt*, 74 F. Supp. 2d at 433–34.

Santos identifies potential sources of prejudice: exculpatory documents indicating that Santos was a subcontractor have been lost or destroyed; witnesses who possess exculpatory evidence have relocated or cannot be located or subpoenaed; material witnesses have died; and material witnesses' memories have been impaired. (Santos's Moving Br. 12–24.)

#### 1. Documents

Santos fails to demonstrate with specificity that the documentary evidence is lost and not cumulative of evidence available from other sources. As for Avanti's binders on the relevant properties that Santos argues would contain exculpatory evidence, Santos fails to demonstrate with specificity that the binders would have contained exculpatory information. Santos also fails to provide sufficient information to conclude that the binders existed, where they were stored, and how they came to be lost or destroyed as a result of delay. (*See* Edds Aff. ¶ 5 (stating that the only

3

binder found was for the only property Avanti Builders owned and primarily built).) As for the additional documentary evidence in the possession of others, Santos fails to demonstrate how that information would be exculpatory and that the information is not cumulative to other information. For example, Santos does not state that the owners of these documents could not be called as witnesses, or that the information in these documents is not contained within the Government's discovery.

### 2. Witnesses Who Have Relocated

Santos also fails to demonstrate with specificity that witnesses who cannot be located, or who are not available, or who have passed away possess evidence that is exculpatory and not cumulative.

First, Santos argues that purportedly exculpatory witnesses Bob Darcey and Andrew Chin, whom the Government disclosed "without conceding that the witnesses' information is . . . exculpatory," cannot be found. (Divine Correspondence 2, Santos's Moving Br. Ex. 48, ECF No. 114-50.) Santos speculates that the witnesses would provide exculpatory information because they were named in what Santos characterizes as a "*Brady* letter," but Santos fails to demonstrate with specificity what testimony the witnesses would provide or how the witnesses would have been located if identified earlier. (Santos's Moving Br. 17.)

Second, Santos argues he will be prejudiced by witness E.M.'s[2] failure to testify, as E.M. currently resides in Brazil. Santos fails to demonstrate with specificity that E.M. possesses noncumulative evidence because the meetings he participated in were recorded and because E.M. has agreed to testify at trial. (Edds Aff. ¶ 4.)

Third, Santos fails to demonstrate with specificity that witness T.C. would provide exculpatory testimony. Santos states that T.C. would testify that she moved into a new construction home and never dealt with Santos in paying rent. Santos, however, offers no basis for this speculation, especially considering that Santos's investigator was unable to contact her. (McMahon Cert. ¶ 14, ECF No. 114-64.)

Fourth, Santos fails to demonstrate with specificity that witness L.N. would provide exculpatory, noncumulative testimony. For example, Santos only speculates that L.N. would testify that he purchased a new-construction home. (Santos's Moving. Br. 18.)

### 3. Witnesses Who Died

Santos also avers he is prejudiced as a result of several potential witnesses passing away during the Government's investigation. Santos, however, fails to demonstrate with specificity that each witness would provide exculpatory, noncumulative testimony. Santos argues: (1) that Margaret Illis and Teresa Illis are the only witnesses who may testify regarding the sale of 46 Barbara Street; (2) that Dino Ciccotti, as owner of NJ Property Realty Services, would testify that he did not deal with Santos in locating tenants or collecting rent payments; (3) that Michel Mikoud would testify that he moved into a new construction home and did not deal with Santos in renting the property

---

[2] Consistent with the Government's practice, the Court will use initials to refer to individuals named by their initials or otherwise anonymized in the Indictment.

4

or paying his rent; and (4) that "Norberto," a contractor hired to work on 118 South 7th Street, could potentially provide exculpatory testimony. (Santos's Moving Br. 18–21.) But for each witness, Santos merely speculates as to the contents of their testimony. Moreover, Santos fails to demonstrate that there are no other witnesses or other evidence that would render the purported testimony noncumulative.

### 4. Witnesses' Impaired Memories

Santos avers that "almost all of the witnesses whom [Santos's] private investigator has interviewed have at least somewhat impaired memories, leaving [Santos] without the defense to which he is entitled." (Santos's Moving Br. 23.) Santos documents that several individuals related to the properties have faded memories but fails to demonstrate with specificity what the witnesses would have testified to, how that testimony would be exculpatory, and that their testimony would be noncumulative of existing, available evidence or testimony.

Santos fails to show that the Government deliberately delayed bringing the Indictment in order to obtain an improper advantage and fails to show that he was prejudiced as a result of any delay. The Court, accordingly, denies Santos's motion to dismiss the Indictment on the basis of delay. To the extent Simoes incorporates Santos's arguments in his motion to dismiss the Indictment, that basis for dismissal is also denied.

## II. Defendants' Motions to Dismiss the Indictment for Failure to Provide Adequate Notice of Allegations (or in the Alternative, to Grant a Bill of Particulars)

Santos moves to dismiss the Indictment for failure to provide adequate notice of the allegations, or in the alternative, moves for a bill of particulars. Simoes, by two separate motions, seeks to dismiss the Indictment for failure to provide adequate notice of the allegations and seeks a bill of particulars. Because Defendants' arguments are substantively similar, the Court addresses both here. The Court first addresses the motions to dismiss the Indictment, then the motions for a bill of particulars.

"An indictment must contain 'a plain, concise and definite written statement of the essential facts constituting the offense charged.'" *United States v. Urban*, 404 F.3d 754, 771 (3d Cir. 2005) (citing Fed. R. Crim. P. 7(c)(1)). An indictment is facially sufficient to warrant a trial on the merits if it "(1) contains the elements of the offense intended to be charged, (2) sufficiently apprises the defendant of what he must be prepared to meet, and (3) allows the defendant to show with accuracy to what extent he may plead a former acquittal or conviction in the event of a subsequent prosecution." *United States v. Huet*, 665 F.3d 588, 595 (3d Cir. 2012). "[N]o greater specificity than the statutory language is required so long as there is sufficient factual orientation to permit the defendant to prepare his defense and to invoke double jeopardy . . . ." *United States v. Rankin*, 870 F.2d 109, 112 (3d Cir. 1989).

Here, the Court finds there is sufficient factual orientation to permit Defendants to prepare their defenses and invoke double jeopardy. The Indictment alleges, for all charges, that Defendants sought to unlawfully enrich themselves by recruiting straw buyers to purchase properties in the straw buyers' names, provided down payment funds for the straw buyers, submitted false loan applications and HUD-1 settlement statements, diverted the loan funds for their own use, and paid

the monthly mortgage payments for a period of time before causing the mortgage loans to enter default. (Indictment Count One ¶ 12, ECF No. 64.)

As to Count One, the Indictment specifies that Santos recruited and promised to pay straw buyers; submitted false loan applications that misrepresented the true buyer of the property, that the straw buyer intended to occupy the property, and that the straw buyer was supplying the down payment; and submitted false HUD-1 settlement statements that falsely stated that the straw buyers paid their own cash-to-close obligations. (Indictment Count One ¶¶ 14, 16.) The Indictment specifies that Simoes submitted false HUD-1 settlement statements with the same misrepresentations and concealed the intended disbursements from the victim bank. (Indictment Count One ¶¶ 16–17.) Counts Two through Ten incorporate the same Manner and Means of Count One, and the summary table identifies which defendant's conduct is alleged for each specific property closed on a certain date. (Indictment Counts Two through Ten ¶¶ 1–2.) Finally, Counts Eleven through Nineteen incorporate the same Manner and Means of Count One, which identifies the false statements made on loan applications and HUD-1 settlement statements, and the summary table similarly identifies which defendant's conduct is alleged for each specific property closed on a certain date. (Indictment Counts Eleven through Nineteen ¶¶ 1–2.)[3]

Altogether, the Indictment "sufficiently apprises [Defendants] of what [they] must be prepared to meet" at trial and provides a sufficient factual orientation to permit Defendants to prepare their defenses. *Huet*, 665 F.3d at 595. The Court, accordingly, denies both Defendants' motions to dismiss the Indictment for failure to provide adequate notice of the allegations.

In the alternative, Defendants seek a bill of particulars clarifying aspects of the Indictment. (Santos's Moving Br. 29; Simoes's Mot. Bill of Particulars, ECF No. 110.)

"The purpose of a bill of particulars is to inform the defendant of the nature of the charges brought against him, to adequately prepare his defense, to avoid surprise during the trial and to protect him against a second prosecution for an inadequately described offense." *United States v. Urban*, 404 F.3d 754, 771 (3d Cir. 2005) (internal quotation marks and citation omitted). A court should only order a bill of particulars when "an indictment's failure to provide factual or legal information significantly impairs the defendant's ability to prepare his defense or is likely to lead to prejudicial surprise at trial." *United States v. DePaoli*, 41 F. App'x 543, 546 (3d Cir. 2002).

In deciding whether to grant a bill of particulars, the Court may consider the information made available to the defendants through discovery as well as information in the Indictment. *See United States v. Wolff*, No. 11-719, 2013 WL 646204, at *2 (D.N.J. Feb. 20, 2013). "[A bill of particulars] is intended to give the defendant only that minimum amount of information necessary to permit the defendant to conduct his own investigation. Further, access to discovery weakens the case for a bill of particulars." *United States v. Atwell*, No. 13-0560, 2015 WL 2092687, at *5 (D.N.J. May

---

[3] Simoes also argues that the Indictment "lacks specificity with regard to what fraud was com[m]itted by [Simoes]." (*See* Tr. 23:17–18.) With respect to Simoes, the Court finds that the Indictment does not group Simoes generally with other defendants but alleges his conduct specifically. *Compare* Indictment Count One ¶¶ 16, 17, 18 (specifying Simoes's conduct), *with* Indictment Count One ¶¶ 13, 14, 15, 19, 20, 21 (specifying other defendants' conduct).

6

5, 2015) (cleaned up) (citing *United States v. Smith*, 776 F.2d 1104, 1111 (3d Cir. 1985); *Urban*, 404 F.3d at 772).

Santos requests that the Government provide more information concerning: (1) specific conduct Santos performed to participate in the conspiracy and the substantive counts; (2) the identity of the unnamed "others" with whom Santos is alleged to have acted; (3) the locations where Santos completed the acts; (4) the straw buyers for whom Santos allegedly provided down payments; (5) which properties and sellers Santos allegedly located as part of the bank fraud; (6) which loan applications and HUD-1 settlement statements Santos submitted, and what was false in those documents; (7) what cashier's checks Santos submitted to Simoes in furtherance of the bank fraud; (8) what fraudulently obtained loan funds Santos caused the victim bank to submit to Simoes's attorney trust account; (9) what deposits and disbursements Santos made for his personal use; and (10) what properties Santos caused to enter default. (Santos's Moving Br. 33–46.)

Simoes requests that the Government provide more information concerning: (1) Simoes's specific conduct with respect to the three Subject Properties and the bank fraud charges in the Indictment; (2) which false statements Simoes made to the victim bank; and (3) the names of the alleged co-conspirators and participants. (Simoes's Mot. Bill of Particulars 3–5.)

The Government has provided over 30,000 pages of discovery, including: (1) recordings, translations, and transcripts of the October 2008 meetings; (2) the loan servicing files from the victim bank for each of the transactions and loans; (3) interview notes and documents from the victim bank's investigation; (4) policies and documents from the victim bank; (5) bank records of Simoes's trust account, Chimanski Construction, Avanti Builders, Santos & Santos, and other bank accounts; (6) documents from the straw borrowers, including wage and employment information and records of one borrower's loan to Santos and Chimanski; (7) construction permits and applications for the relevant properties; (8) documents from Simoes & Associates as well as from sellers of the properties; (9) water and sewer records for the properties; (10) phone records for Santos, Chimanski, and Arsenio Santos; (11) recorded custodial interviews of Arsenio Santos and Raquel Casalinho; (12) a check from Simoes & Associates to Co-Conspirator 1 referenced in paragraph 22(1) of the Indictment; (13) the identities of the straw buyers, property sellers, and loan officers; and (14) bank records and mortgage files for the sale of 172 Scheerer Avenue, 25 Governor Street, and 29 Bragaw Avenue. (Divine Decl. ¶¶ 3–6, ECF No. 120-1.) The Government also provided preindictment discovery and participated in at least one "show-and-tell." (*Id.* ¶ 2.)

Defendants' requests for the identities of co-conspirators and participants are unnecessary. The Court finds that the Indictment and discovery provide Defendants with sufficient information to conduct their own investigation into the co-conspirators and participants. Moreover, the Court finds that the cases cited by Defendants directing the identification of co-conspirators are distinguishable because the alleged conspiracy here is more limited in scope and number of alleged co-conspirators. *See, e.g., United States v. Vastola*, 670 F. Supp. 1244, 1251–52, 1269–70 (D.N.J. 1987) (granting in part a motion for a bill of particulars in case with twenty-one defendants and a 114-count indictment).

Defendants' requests for the specific dates and locations of events in the Indictment are also inappropriate. Where the Government has provided extensive discovery of the loan files and bank records, which reveal the location of the closing of the transactions, the approximate dates false

7

statements were transmitted, and the dates and locations of withdrawals and deposits, Defendants have sufficient information to conduct their own investigation and Defendants' ability to prepare for trial is not significantly impaired.

Defendants' requests for a list of every false document or statement submitted are unnecessary because the Indictment and discovery already provide the minimum information necessary for Defendants to conduct their own investigation. The Indictment identifies the major documents alleged to be false in connection with specific home purchases; alleges specific false statements, such as statements purporting that the straw buyers were the source of cash-to-close funds or that the straw buyers intended to occupy the homes; and refers to other unspecified documents that may contain the same false statements. Here, the Indictment puts Defendants on notice of what they should be prepared to face at trial and provides enough information for Defendants to conduct their own investigation.

Defendants' requests for the specific conduct alleged for each Defendant's role in the conspiracy, bank fraud, and false statements charges are unnecessary because the Indictment provides sufficient information, discovery has provided records for the relevant transactions, and the size and scope of the alleged conspiracy is not so large as to prevent Defendants from understanding their alleged role in the charged offenses.

Finally, the Court finds that Defendants have not shown that the Indictment is so generalized and discovery so voluminous that a bill of particulars is necessary. (*See* Santos's Reply Br. 27–30.) Cases cited by Santos are distinguishable because the indictments either provided less information than the Indictment here or the discovery and scope of the cases were significantly greater than those here.[4] The Court, therefore, denies Defendants' alternative motions seeking a bill of particulars.

### III. Santos's Motion to Suppress Identification of Victor Santos

A court must suppress evidence of a pretrial identification when the identification procedure was "so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *United States v. Foote*, 432 F. App'x 151, 153 (3d Cir. 2011). A court employs a two-step approach: first, the Court determines whether the procedure was "unnecessarily or impermissibly suggestive"; if so, the Court then determines whether it was so suggestive that it "gave rise to a substantial likelihood of misidentification amounting to a violation of due process." *Id.* at 154.

Preceding the identification by R.T., "R.T. stated that he recalled that Victor Santos attended the closing for the purchase of 46 Barbara Street." (Edds Aff. ¶ 6; *see* McMahon Cert. ¶ 13.) According to the Government, FBI agents then "showed R.T. one photograph each of [twelve] individuals that [the FBI] believed . . . were involved in real estate transactions related to the Santos

---

[4] *See, e.g., United States v. Aispuro*, No. 08-2936, 2010 WL 1404196 (D.N.M. Mar. 16, 2010); *United States v. Arberry*, No. 06-278, 2007 WL 9706396 (E.D. Wisc. Feb. 15, 2007); *United States v. Anderson*, 441 F. Supp. 2d 15, 19 (D.D.C. 2006); *United States v. Bin Laden*, 92 F. Supp. 2d 225, 234 (S.D.N.Y. 2000), *aff'd*, 552 F.3d 93 (2d Cir. 2008).

investigation." (Edds Aff. ¶ 7.) The agents "showed R.T. each photograph, one at a time, and asked him if he could identify the individual," without providing "any further information about the individuals in the photographs." (*Id.* ¶ 8.) R.T. identified four of the twelve individuals, including Victor Santos. (*Id.*)

According to Santos's investigator, R.T. "stated that at the meeting, the FBI showed [R.T.] what he believed to be a picture of [Santos], which was presented by itself, . . . with no other pictures." (McMahon Cert. ¶ 13.) Santos argues that R.T. described a "show-up," where a witness is presented with a single photograph of a particular suspect, "rather than including that photograph in a properly constructed photo array," and asked if the photograph depicts the suspect. (Santos's Moving Br. 47.) This identification procedure has been found impermissibly suggestive. *See, e.g., United States v. Brownlee*, 454 F.3d 131, 138 (3d Cir. 2006) ("As the Supreme Court has acknowledged, a show-up procedure is inherently suggestive because, by its very nature, it suggests that [law enforcement] think they have caught the perpetrator of the crime."). The Court, however, finds that R.T.'s description does not describe a show-up and interprets R.T.'s description as consistent with the FBI's description of the procedure: Santos's photo was not presented to R.T. as part of a photo array, but by itself in sequence with other photos; R.T. was not asked if any photo depicted Santos, but if R.T. could identify any person depicted in any of the photos.

The identification procedure here is not unnecessarily or impermissibly suggestive because the agents presented R.T. with several photographs and asked him to identify anyone he knew, without any additional information or direction. The agents did not imply that Santos would be among the photographs and did not show R.T. only a single photograph of Santos. This Court follows other courts that have addressed similar identification procedures and found the procedures not impermissibly suggestive. *United States v. Omar*, 786 F.3d 1104, 1108–10 (8th Cir. 2015) (finding procedure not impermissibly suggestive where investigators showed a series of photographs one at a time and asked open-ended questions about whether the witness knew the person in the photograph); *United States v. Nunez-Guzman*, 554 F. App'x 507, 510–13 (7th Cir. 2014) (finding procedure not impermissibly suggestive where the investigator "showed [the witness] a series of photographs . . . and asked [the witness] to identify anyone he knew"); *see also United States v. Moore*, 240 F. App'x 699, 706 (6th Cir. 2007) (finding procedure not unduly suggestive where the witness was shown a single photograph and asked to "explain where [he] recognize[d] [the person] from, [and] any name [he] may know [the person] by" (internal quotation marks omitted) (alterations in original)).

Because the photo identification procedure was not unnecessarily or impermissibly suggestive, the Court need not reach the second step of the analysis. The Court, accordingly, denies Santos's motion to suppress the identification or hold a hearing on the suggestiveness of the identification.

## IV. Simoes's Motion for Severance of the Trial

Simoes argues that the trial must be severed because otherwise he would be unable to compel Santos to testify and because a joint trial risks transference of guilt from Santos to him. "If the joinder of . . . defendants in an indictment . . . appears to prejudice a defendant . . . the court may order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires." Fed. R. Crim. P. 14. The burden of showing prejudice is on the defendant seeking

severance. *United States v. Eufrasio*, 935 F.2d 553, 568 (3d Cir. 1991). The defendant must show that "denial of severance would lead to clear and substantial prejudice resulting in a manifestly unfair trial." *Urban*, 404 F.3d at 775. This amounts to a showing that "there is a serious risk that a joint trial would compromise a specific trial right" or "prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro v. United States*, 506 U.S. 534, 539 (1993). "[L]ess drastic measures, such as limiting instructions, often will suffice to cure any risk of prejudice." *Id.* (citing *Richardson v. Marsh*, 481 U.S. 200, 211 (1987)).

In determining whether to sever a trial based on mutually antagonistic defenses, a court considers the following factors: "(1) the likelihood of co-defendants testifying; (2) the degree to which such testimony would be exculpatory; (3) the degree to which the testifying co-defendants could be impeached; [and] (4) judicial economy." *United States v. Boscia*, 573 F.2d 827, 832 (3d Cir. 1978).

Simoes fails to address whether Santos would testify in Simoes's trial if trial were severed. (*See generally* Simoes's Mot. Severance, ECF No. 112-1; Tr. at 29:9–16.) Simoes also fails to discuss how Santos's testimony would be exculpatory or the risk that Santos's testimony would be impeached following Santos's trial. (Simoes's Mot. Severance; Tr. at 29:9–16.) Finally, the Court finds that judicial economy weighs in favor of a joint trial. Simoes, accordingly, fails to meet his burden of showing prejudice resulting from mutually antagonistic defenses.

Turning to Simoes's argument that the trial should be severed to avoid the risk of guilt transference, Simoes's argument appears premised upon a mischaracterization of the Government's case that would indicate there is a disparity in evidence against Santos and Simoes.[5] Even assuming there is a disparity in evidence, Simoes fails to show prejudice resulting from the potential for guilt transference. Simoes fails to show that there is evidence that would be admissible against Santos that would be inadmissible against him such that the jury should not consider it in a joint trial. *See Zafiro*, 506 U.S. at 539–41 (stating one reason for severing trial is where "evidence that the jury should not consider against a defendant and that would not be admissible if a defendant were tried alone is admitted against a codefendant"). Simoes, accordingly, fails to meet his burden to show prejudice requiring severance of the trial. The Court finds any issues arising from the joint trial of co-defendants are better addressed with jury instructions. The Court denies Simoes's Motion to sever the trial.

## V. Simoes's Motion for *Brady* and *Giglio* Materials

The Fifth Amendment requires the Government to disclose information to a defendant that is material to guilt or punishment. *Brady v. Maryland*, 373 U.S. 83, 87 (1963). Here, Simoes requests that the Government provide all mortgage loan applications, sales contracts, HUD-1 settlement statements, real estate closing documents; rough notes of FBI agents and Assistant U.S. Attorneys

---

[5] Simoes argues, "the Government relayed Chimanski's statement that 'Simoes did not know about the submission of two HUD-1 statements for any of the properties.'" (Simoes's Mot. Severance 5.) The referenced correspondence states: "Chimanski advised that he was unaware of Simoes completing two HUD-1's on any of the transactions that are the subject of the indictment." (Divine Correspondence 2, Simoes's Mot. Severance Ex. A, ECF No. 112-2.)

that suggest exculpatory information; and bank documents, policies, and regulations. (*See generally* Simoes's Mot. Release of *Brady* Materials, ECF No. 111-1.)

The Court, on October 3, 2018, ordered the Government to provide all exculpatory evidence under *Brady* by November 2, 2018, and ordered the Government to continue to disclose *Brady* material as it became known going forward. (Scheduling Order, ECF No. 70.) The Government states that it "understands its *Brady* obligations and will fully comply with them," including "promptly disclos[ing] to [Defendants] all exculpatory evidence in its possession that is material to guilt in sufficient time for its use at trial." (Government's Opp'n Br. 60, ECF No. 120.) The Government also submits that it has provided mortgage applications; sales contracts; HUD-1 settlement statements; real estate closing documents; and bank documents, policies, and regulations through discovery. (*See* Divine Decl. ¶¶ 3–6.) The Court, accordingly, denies Simoes's motion to produce these materials under *Brady* as moot.

Regarding Simoes's request for the Government to preserve and produce rough notes and draft reports, the Government has indicated that it continues to comply with its obligation to preserve this material and will produce it "as required by law at the appropriate time." (Government's Opp'n Br. 63.) The Court, accordingly, denies Simoes's motion to order the Government to preserve rough notes and draft reports as moot.

The Court next turns to Simoes's request that the Government produce the rough notes and draft reports. "[T]he government must retain and, upon motion, make available to the district court both the rough notes and the drafts of reports of its agents to facilitate the district court's determination whether they should be produced." *United States v. Ammar*, 714 F.2d 238, 259 (3d Cir. 1983). Rough notes and draft reports "are subject to production by the government only to the extent that they either contain *Brady* material or constitute statements falling under the Jencks Act. *United States v. Chrysanthopoulos*, No. 12-672, 2013 WL 4833563, at *3 (D.N.J. Sept. 10, 2013).

The Court denies without prejudice Simoes's motion to compel production of rough notes or draft reports under *Brady* as moot because the Government represents that it has complied with its obligations under *Brady* and the Court's October 4, 2018 Order. To the extent any rough notes or draft reports sought by Simoes fall within the areas of disclosure covered by *Brady* and have not been produced by the Government, the Government must produce those materials to the Court for *in camera* review in accordance with the Court's October 4, 2018 Order.

To the extent Simoes seeks the production of any rough notes and draft reports not covered by *Brady*, Simoes's motion is denied without prejudice. Simoes may renew this motion at trial subject to a specific showing that particular rough notes or draft reports not produced may contain information within the purview of *Brady*.

The Court finally turns to Simoes's motion to produce *Giglio* materials. Under *Giglio v. United States*, 405 U.S. 150 (1972), the Government must "disclose evidence that goes to the credibility of . . . prosecution witnesses." *Buehl v. Vaughn*, 166 F.3d 163, 181 (3d Cir. 1999). Because this evidence is only necessary for impeachment purposes, and is typically disclosed only in anticipation of testimony, the Court denies Simoes's motion to produce materials under *Giglio* as premature. *See United States v. Higgs*, 713 F.2d 39, 43–45 (3d Cir. 1983). The Court will specify

a deadline for the Government to produce materials under *Giglio* in its final pretrial scheduling order.

## VI. Conclusion

In sum, the Court (1) denies Santos's motion to dismiss the Indictment based on preindictment delay; (2) denies Defendants' motions to dismiss the Indictment, or grant a bill of particulars, for failure to provide adequate notice of the allegations; (3) denies Santos's motion to suppress the photo identification or for a *Wade* hearing; (4) denies Simoes's motion to sever the trial; and (5) denies Simoes's motion to compel production of *Brady* and *Giglio* material.

## VII. Order

Based on the foregoing, and for other good cause shown,

**IT IS** on this 13th day of January 2020, **ORDERED** that:

1. Santos's Omnibus Motion (ECF No. 114) is **DENIED**.

2. Simoes's Motion for a Bill of Particulars (ECF No. 110) is **DENIED**.

3. Simoes's Motion for Release of *Brady* Materials (ECF No. 111) is **DENIED** without prejudice.

4. Simoes's Motion for Severance (ECF No. 112) is **DENIED**.

5. Simoes's Motion to Dismiss the Indictment (ECF No. 113) is **DENIED**.

s/ Michael A. Shipp
**MICHAEL A. SHIPP**
**UNITED STATES DISTRICT JUDGE**