**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>VICTOR SANTOS *et al.* | Criminal Action No. 18-585 (MAS)<br><br>**MEMORANDUM OPINION**<br>**(Under Temporary Seal)** |

**SHIPP, District Judge**

      This matter comes before the Court on several motions from the parties. Most are sets of separate motions *in limine* filed by Defendant Victor Santos ("Santos") (ECF No. 201), Defendant Fausto Simoes ("Simoes") (ECF No. 202), and the United States of America (the "Government") (ECF No. 203). Santos and Simoes separately opposed the Government's motions *in limine* (ECF Nos. 207, 210), and the Government replied (ECF No. 218). The Government opposed Santos's and Simoes's motions *in limine* (ECF No. 209), and Santos and Simoes separately replied (ECF Nos. 216, 219). Also before the Court is Simoes's Motion to Dismiss (ECF No. 208), to which the Government opposed (ECF No. 213), and Simoes replied (ECF No. 215). Finally, before the Court is Simoes's Motion to Release *Brady* Materials (ECF No. 212), to which the Government opposed (ECF No. 217), and Simoes replied (ECF No. 220). The Court has carefully considered the parties' submissions and decides the matter without oral argument under Local Civil Rule 78.1, which is applicable to criminal cases under Local Criminal Rule 1.1.

## I.      BACKGROUND

      This case arises out of an alleged scheme hatched by Defendants Victor Santos, Arsenio Santos, and Fausto Simoes (collectively, "Defendants") during the financial crisis of 2007–2008. As alleged in the Indictment, the trio conspired to use straw buyers to purchase properties throughout New Jersey to fraudulently obtain mortgage loans from Wells Fargo. The scheme

worked like this: *First*, Defendants recruited straw buyers to purchase residential properties. *Second*, Defendants agreed to pay the straw buyers' down payments. *Third*, the straw buyers obtained mortgage loans from Wells Fargo by filling out fraudulent mortgage loan documents, indicating that they would use the purchased properties as primary residences. *Fourth*, once Wells Fargo approved the mortgage loan, the straw buyers diverted the loan proceeds to Defendants. *Fifth*, Defendants paid the first few months' mortgage payments on the purchased properties. *Sixth*, Defendants eventually stopped paying, and the straw buyers defaulted. (Indictment 4-5, ECF No. 64.) Defendants carried out this scheme at least nine times with properties in Newark, New Jersey. (*Id.* at 13.)[1] As a result, the Indictment charges Defendants with one count of conspiracy to commit bank fraud in violation of 18 U.S.C. § 1349, nine counts of bank fraud in violation of 18 U.S.C. § 1344(2), and nine counts of false statements in violation of 18 U.S.C. § 1014(2). (*Id.* at 1, 12, 14.)

Now before the Court are several motions. Up first are three sets of motions *in limine*, which seek various preliminary rulings on the admissibility of evidence, including evidence of Wells Fargo's alleged misconduct in reviewing loan applications, certain business and public records, summary charts, and lay opinion testimony. Next is a Motion to Dismiss filed by Simoes, where he argues that the Government distorted the factfinding purpose of trial by refusing to indict another coconspirator, Raquel Casalinho. Similarly, Simoes also moves the Court for an order mandating that the Government turnover any *Brady* material relevant to the Government's decisions not to charge Wells Fargo employees.

---

[1] The nine Newark properties identified in the Indictment are 14 Willoughby Street, 226 West Runyon Street, 44 Dewey Street, 170 Scheerer Avenue, 168 Scheerer Avenue, 46 Barbara Street, 118 South 7th Street, 27 Governor Street, and 15 Vine Street. (Indictment 13.) The Government also avers that, although not listed in the Indictment, three additional Newark properties are relevant to the conspiracy count: 172 Scheerer Avenue, 25 Governor Street, and 29 Bragaw Avenue. (*See* Gov't's Opp'n Br. to Defs.' Mot. in Limine 1, ECF No. 209.)

## II.    LEGAL STANDARD

### A.    Motion *in Limine*

"Although the Federal Rules of Evidence do not explicitly authorize *in limine* rulings, the practice has developed pursuant to the district court's inherent authority to manage the course of trials." *Luce v. United States*, 469 U.S. 38, 41 n.4 (1984). Federal trial courts often find it appropriate to rule on pre-trial *in limine* motions to exclude or admit certain evidence so that "the court can shield the jury from unfairly prejudicial or irrelevant evidence." *Ebenhoech v. Koppers Indus., Inc.*, 239 F. Supp. 2d 455, 461 (D.N.J. 2002) (citing *United States v. Romano*, 849 F.2d 812, 815 (3d Cir. 1988)). "The *in limine* motion then fosters efficiency for the court and for counsel by preventing needless argument at trial." *Id.* "Because a ruling on a motion *in limine* is 'subject to change as the case unfolds,' this ruling constitutes a preliminary determination in preparation for trial." *United States v. Perez*, No. 09-1153, 2011 WL 1431985, at *1 (S.D.N.Y. Apr. 12, 2011) (quoting *Palmieri v. Defaria*, 88 F.3d 136, 139 (2d Cir. 1996)).

### B.    Motion to Dismiss

Defendants may bring motions to dismiss criminal pleadings under Federal Rule of Criminal Procedure 12. "In considering a defense motion to dismiss an indictment, the district court accepts as true the factual allegations set forth in the indictment." *United States v. Besmajian*, 910 F.2d 1153, 1154 (3d Cir. 1990).

Here, Simoes bases his Motion to Dismiss on prosecutorial misconduct. "Improper prosecutorial conduct rises to the level of constitutional error 'when the impact of the misconduct is to distract the trier of fact and thus raise doubts as to the fairness of the trial.'" *United States v. Morena*, 547 F.3d 191, 194-95 (3d Cir. 2008) (quoting *Marshall v. Hendricks*, 307 F.3d 36, 67 (3d Cir. 2002)). Courts assess prosecutorial-misconduct claims by whether the asserted misconduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Marshall*, 307 F.3d at 64 (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)). In

addition, misconduct does not result in an unfair trial where "the evidence [against the defendant] is strong" and "the curative instructions [are] adequate." *Morena*, 547 F.3d at 196 (citing *Moore v. Morton*, 255 F.3d 95, 113 (3d Cir. 2001)).

### C.    Motion to Release *Brady* Material

Under *Brady v. Maryland*, prosecutors must "disclose material exculpatory evidence to the defense." *Marshall*, 307 F.3d at 52 (citing 373 U.S. 83 (1963)). To that end, prosecutors must "learn of any favorable evidence known to the others acting on the government's behalf." *Dennis v. Sec'y, Pa. Dep't of Corr.*, 834 F.3d 263, 284 (3d Cir. 2016) (quoting *Strickler v. Greene*, 527 U.S. 263, 281 (1999)). In addition, the prosecutor's duty is "absolute" and does not "depend on defense counsel's actions." *Id.* at 290 (citing *United States v. Agurs*, 427 U.S. 97, 107 (1976)).

## III.    **DISCUSSION**

### A.    The Government's Motions *in Limine*

The Court considers the Government's motions *in limine* first, as these motions dispose of issues raised in Santos's and Simoes's motions. The Government moves for eight preliminary rulings: (1) to preclude evidence of Wells Fargo's alleged misconduct in their lending practices; (2) to preclude evidence of Santos's and Simoes's potential punishment; (3) to admit certain documents as authenticated business records; (4) to admit certain exhibits as authenticated public records; (5) to admit summary charts; (6) to rule that testimony by former and current Wells Fargo employees on Wells Fargo's lending practices is permissible fact and lay opinion testimony; (7) to rule that testimony by witnesses familiar with Santos's and Simoes's signatures on those signatures' authenticity is permissible lay opinion testimony; and (8) to reserve additional motions. (*See generally* Gov't's Mot. in Limine Br., ECF No. 203.) The Court addresses each in turn.[2]

---

[2] Where appropriate, the Court addresses relevant arguments in Santos's and Simoes's briefs.

**Motion *in Limine* #1 (Evidence of Wells Fargo Misconduct)**: The Government first moves to exclude evidence pertaining to Wells Fargo's purported misconduct in approving mortgage loan applications. (*Id.* at 5.) Specifically, the Government seeks to exclude two categories of evidence: (1) various settlement agreements and a class action complaint between Wells Fargo and several government entities and (2) testimonial evidence and argument that Wells Fargo was negligent in its lending practices. (*Id.* at 6-7.) In support, the Government argues that the evidence is both irrelevant and prejudicial because victim negligence is neither a defense to bank fraud nor material to the falsity of Santos and Simoes's statements. (*See id.* at 6-12.) Santos counters that Wells Fargo's misconduct is relevant because it shows that Wells Fargo was not verifying information in mortgage loan applications and because it shows that Wells Fargo itself did not view the allegedly fraudulent statements as material. (Santos's Opp'n Br. to Gov't's Mot. in Limine 3-12, ECF No. 210.) Simoes adds that the evidence shows that Wells Fargo is not simply a negligent victim (but rather an active participant in the fraud) and that the evidence is necessary to effectively cross-examine the Government's witnesses, including current Wells Fargo employees. (Simoes's Opp'n Br. to Gov't's Mot. in Limine 5-9, ECF No. 207.)

The core of the dispute focuses on the materiality prong of the bank-fraud statutes. As relevant here, that statute prohibits defrauding banks "by means of *material* false or fraudulent pretenses, representations or promises." Mod. Crim. Jury Instr. 3d Cir. § 6.18.1344 (2021) (emphasis added); *see also Neder v. United States*, 527 U.S. 1, 25 (1999) ("[M]ateriality of falsehood is an element of the federal mail fraud, wire fraud, and bank fraud statutes."). A materially false statement has "a natural tendency to influence, or [is] capable of influencing, the decision of the decisionmaking body to which it was addressed." *Neder*, 527 U.S. at 16 (alteration in original) (quoting *United States v. Gaudin*, 515 U.S. 506, 509 (1995)). By all counts, courts assess materiality through an objective lens. *E.g.*, *id.* at 22 n.5 ("The Restatement instructs that a

matter is material if . . . a reasonable man would attach importance to its existence or nonexistence in determining his choice of action in the transaction in question . . . ."); *United States v. Betts-Gaston*, 860 F.3d 525, 532 (7th Cir. 2017) ("[W]hether a statement is material depends on its effect on 'a reasonable person'—or, in this case, a reasonable lender."); *United States v. Casher*, No. 19-65, 2020 WL 2557849, at *1 (D. Mont. May 20, 2020) ("Materiality is an objective test that looks at 'the intrinsic capabilities of the false statement itself, rather than the possibility of the actual attainment of its end.'" (quoting *United States v. Peterson*, 538 F.3d 1064, 1072 (9th Cir. 2008))). Indeed, as the U.S. Court of Appeals for the Fourth Circuit summed up, "the correct test for materiality . . . is an objective one, which measures a misrepresentation's capacity to influence an objective 'reasonable lender,' not a renegade lender with a demonstrated habit of disregarding materially false information." *United States v. Raza*, 876 F.3d 604, 621 (4th Cir. 2017).

In the same vein, courts have cautioned that materiality is distinct from actual reliance. *See Neder*, 527 U.S. at 24-25 ("The common-law requirement[] of 'justifiable reliance' . . . plainly ha[s] no place in the federal fraud statutes."). That's because courts measure materiality through a statement's *capacity to* influence and not through its *actual* influence. Put another way, statements can be material even if no one actually finds them material or relies on them. The U.S. Court of Appeals for the Ninth Circuit in *United States v. Lindsey* said it best when it summed up the critical distinction between materiality and reliance. There, the court reasoned that "materiality measures natural capacity to influence" whereas actual reliance measures "whether the statement actually influenced any decision." *United States v. Lindsey*, 850 F.3d 1009, 1017 (9th Cir. 2017) (citation omitted). Thus, evidence of an objective, market view of a false statement "says a lot about" the statement's natural capacity to influence, whereas evidence about a particular bank's view of a false statement "says little or nothing about that statement's inherent ability to affect decision-making." *Id.* Unsurprisingly then, the *Lindsey* Court issued a "bright-line rule against

evidence of individual lender behavior to disprove materiality." *Id.* Other courts have reasoned similarly. *See, e.g., United States v. Wolf*, 860 F.3d 175, 193 (4th Cir. 2017) ("[T]he test for whether a false statement to a bank is material is an objective one; it does not change from bank to bank."); *United States v. Reynolds*, 189 F.3d 521, 525 (7th Cir. 1999) (rejecting argument that materiality inquiry "focuses specifically on the defendant's ability to affect the decision" of bank because "the proper inquiry addresses . . . the nature of statements made"); *United States v. Lankford*, No. 10-398, 2013 WL 2295988, at *2 (E.D. Cal. May 24, 2013) ("A statement's intrinsic capacity to influence, not its effect or how it is received by the victim, is the focus of the crime.").[3]

Distilled down, the Court can determine what is—and is not—relevant to a false statement's materiality. *First*, because materiality is objective, evidence of overall market lending practices is relevant to determining what constitutes a reasonable lender. Conversely, evidence of Wells Fargo's specific lending practices (and especially what Wells Fargo found to be material) is not relevant. *Second*, because materiality focuses on objective industry practices, evidence tending to disprove a prevailing market practice is relevant to what a reasonable lender might find material. In contrast, evidence of a specific lender's deviation from industry practices is not relevant as evidence of victim misconduct is not a defense to bank fraud. *Finally*, because materiality arises from the influential nature of the statements themselves, evidence of procedures used to elicit those statements is relevant. For example, evidence that a bank form requires loan applicants to disclose

---

[3] Against this backdrop, courts have routinely excluded evidence of the lender's activity in fraud cases. *See, e.g., United States v. Leadbeater*, No. 13-121, 2015 WL 567025, at *9 (D.N.J. Feb. 10, 2015) (excluding evidence that lender did not meaningfully review loan applications because "[t]he Government need not show that the lenders were actually duped; they need to show that [d]efendants had an agreement to defraud" (citation omitted)); *United States v. Gaver*, No. 17-640, 2018 WL 3475455, at *2 (D. Md. July 19, 2018) (excluding evidence of Santander Bank's negligence or lack of diligence in reviewing loan applications as irrelevant); *cf. Lankford*, 2013 WL 2295988, at *2 (denying discovery of victim-bank's "loan underwriting policies, marketing strategies, fraud reports, commission structures, etc." because "[t]he materiality of the statements does not depend on whether a statement was 'material' from the perspective of the victim").

their income is evidence that banks find information about income material. What is not relevant, however, is evidence that bank officials found certain statements to be significant or would have changed their behavior in response to those statements. That evidence crosses the line into subjective evidence of reliance, which, as stated, is relevant neither to bank fraud nor under an objective lens.

What does this all mean for the Government's motion? What's clear is that Santos and Simoes may not put on evidence or argue that Wells Fargo's misconduct undercuts the Government's case. That evidence simply is not relevant to any of the causes of action here. That's so because, as discussed above, courts assess materiality from the lens of a reasonable lender, not a specific one. *See Betts-Gaston*, 860 F.3d at 532. Nor is Wells Fargo's reliance (or non-reliance) relevant; reliance is not an element of the charged crimes. *See Neder*, 527 U.S. at 24-25. Nor is Wells Fargo's purported misconduct a defense to fraud. *See United States v. Coyle*, 63 F.3d 1239, 1244 (3d Cir. 1995) ("The negligence of the victim in failing to discover a fraudulent scheme is not a defense to criminal conduct."). Indeed, what Wells Fargo viewed as material—now or years ago—does not tend to disprove the allegedly fraudulent statements' materiality. Thus, Santos and Simoes should not introduce documentary evidence, testimony, or attorney argument about Wells Fargo's or its employees' purported misconduct in lending practices. *See Leadbeater*, 2015 WL 567025, at *9 ("Whether the victim lenders reviewed [d]efendants' allegedly fraudulent loan applications, or whether the lenders used appropriate care in reviewing them, is of no import, so long as the co-conspirators agreed to submit applications that included a material misrepresentation that was reasonably calculated to deceive persons of ordinary prudence and comprehension.").

The door swings both ways, however. Just as Santos and Simoes may not introduce evidence of Wells Fargo's purported misconduct, so too may the Government not put on evidence

of Wells Fargo's sanitized conduct. Indeed, because materiality "does not change from bank to bank," the Government has no need for specific documents or testimony about whether Wells Fargo or its employees viewed specific statements as material. *See Wolf*, 860 F.3d at 193. That evidence would leave the jury with the misleading impression that Wells Fargo's sense of materiality controls in fraud cases. To be sure, the Government may introduce evidence of Wells Fargo's lending practices to establish a necessary context for the jury. *See Casher*, 2020 WL 2557849, at *2 ("Before even reaching the issue of materiality, the Government must establish that the allegedly false statements were, in fact, false. To do this, the Government must provide the jury context for the statements: for example, [the bank's] loan approval process, the information it solicits from customers in its loan documents, and how [the bank] evaluates and uses the information."). It should not, however, open the door to whether Wells Fargo's specific lending practices shed light on the materiality of Santos's and Simoes's false statements.[4]

**Motion *in Limine* #2 (Santos's and Simoes's Potential Punishments)**: The Government next moves to exclude Santos and Simoes from introducing evidence and argument concerning their potential punishments. (Gov't's Mot. in Limine Br. 12-14.) It argues that this evidence is irrelevant and prejudicial because the jury has no sentencing function. (*Id.* (quoting, for example, *Shannon v. United States*, 512 U.S. 573, 579 (1994)).) Santos and Simoes do not oppose excluding evidence of their potential punishments but ask the Court to clarify that they may cross-examine Government witnesses on potential penalties those witnesses would have faced absent cooperation. (Santos's Opp'n Br. to Gov't's Mot. in Limine 17; Simoes's Opp'n Br. to Gov't's Mot. in Limine

---

[4] Of course, should the Government open that door, Santos and Simoes may cross-examine, as appropriate. *See Leadbeater*, 2015 WL 567025, at *9 ("However, if the Government witnesses testify that they relied on the representations in the loan applications, Defendants may cross-examine the witnesses on this reliance.").

9-10.) The Government does not oppose Santos and Simoes's requested clarification. (Gov't's Mot. in Limine Reply Br. 2, ECF No. 218.)

The parties appear to agree. For good reason: a non-sentencing jury should not hear evidence about "what the consequences of its verdict might be." *United States v. Fisher*, 10 F.3d 115, 121 (3d Cir. 1993). Santos and Simoes should not introduce evidence or argument pertaining to their potential punishments. As to whether they may cross-examine cooperating Government witnesses about those witnesses' potential penalties, they may. *See United States v. Chandler*, 326 F.3d 210, 222 (3d Cir. 2003) ("A criminal defendant states a violation of the Confrontation Clause by showing that he was prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness, and thereby to expose to the jury the facts from which jurors . . . could appropriately draw inferences relating to the reliability of the witness." (internal quotation marks omitted) (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 680 (1986))).

**Motion *in Limine* #3 (Business Records)**: The Government next moves for a ruling that several exhibits are authenticated business records under Rules 902(11) and 803(6). (Gov't's Mot. in Limine Br. 14-23.) Santos in turn objects to several as inadmissible hearsay. (Santos's Opp'n Br. to Gov't's Mot. in Limine 13-16.) After rounds of briefing, eight exhibits appear to be at issue: 415, 814, 1300, and 1400–1404. The Government proffers that it will address Santos's objections to, or not offer into evidence, the remainder of the exhibits. (*See* Gov't's Mot. in Limine Reply Br. 12 n.3.)[5]

To start, the Government proffers several exhibits as an exception to the usual rule against hearsay. Under the business records exception, the Government must meet five requirements:

---

[5] Specifically, the Government proffers that it will not introduce Exhibits 1511, 1512, 1601, and 3902–3905 and will redact the handwriting on Exhibit 100 and part of Exhibit 1101.

(6) Records of a Regularly Conducted Activity. A record of an act, event, condition, opinion, or diagnosis if:

> (A) the record was made at or near the time by—or from information transmitted by—someone with knowledge;

> (B) the record was kept in the course of a regularly conducted activity of a business, organization, occupation, or calling, whether or not for profit;

> (C) making the record was a regular practice of that activity;

> (D) all these conditions are shown by the testimony of the custodian or another qualified witness, or by a certification that complies with Rule 902(11) or (12) or with a statute permitting certification; and

> (E) the opponent does not show that the source of information or the method or circumstances of preparation indicate a lack of trustworthiness.

Fed. R. Evid. 803(6). "Rule 803(6) is designed to capture records that are likely accurate and reliable in content, as demonstrated by the trustworthiness of the underlying sources of information and the process by which and purposes for which that information is recorded." *United States v. Browne*, 834 F.3d 403, 435 (3d Cir. 2016).

With the background set, the Court addresses each of the eight exhibits still at issue below.[6]

*Exhibit 415.* Exhibit 415 is a "Retro[active] Appraisal of Real Property." (Gov't's Opp'n Br. to Defs.' Mot. in Limine 36.) On its face, the exhibit was created on May 11, 2009, and appraises one of the nine properties identified in the Indictment (170 Scherer Avenue) as of December 21, 2007. Santos objects to this exhibit's admission as a business record because it was not created at or near the appraisal date nor was it regularly prepared as part of Wells Fargo's business practices. (Santos's Mot. in Limine Br. 33-36, ECF No. 201-1.) The Government counters

---

[6] The Court also addresses relevant arguments in Santos's Motions in Limine.

that the exhibit is a contemporaneous report with historical data rather than a later-prepared appraisal. (Gov't's Opp'n Br. to Defs.' Mot. in Limine 36-38.)

Here, the Court requires the context of trial to rule on the admissibility of this exhibit. Specifically, the Court will await further evidence supporting the Government's contention that "[t]he Retroactive Appraisal was both conducted and recorded in or around May 2009 using certain historic data from in or around December 2007." (Gov't's Opp'n Br. to Defs.' Mot. in Limine 37.) In addition, the Court will await trial to determine whether retroactive appraisals were "kept in the course of a regularly conducted activity" of Wells Fargo and whether they were "a regular practice" for Wells Fargo. Fed. R. Evid. 803(6). For now, the Court reserves on the admissibility of Exhibit 415.

*Exhibit 814.* Exhibit 814 is a letter to Luis A. Lopes from Wells Fargo Home Mortgage. The letter contains handwritten notes that Santos claims are classic hearsay. (Santos's Mot. in Limine Br. 43.) The Government appears to agree that the handwritten portion is hearsay, arguing that the portion may instead be used at trial as a prior consistent statement under Rule 801(d)(1)(B) or to refresh Lopes's recollection under Rule 803(5). (Gov't's Opp'n Br. to Defs.' Mot. in Limine 40-41.) Accordingly, the Court will reserve on the admissibility of Exhibit 814 particularly pending the testimony of Lopes.

*Exhibit 1300.* According to the Government, Exhibit 1300 is "a printout of wire confirmation records of the transactions that are the subject of the Indictment." (Gov't's Opp'n Br. to Defs.' Mot. in Limine 34.) Santos objects to the admission of Exhibit 1300, contending that the exhibit was not prepared at the time of the recorded event and was prepared instead for this litigation. (Santos's Mot. in Limine Br. 31-33 ("[T]his type of compilation of information—as noted, Exhibit 1300 contains excerpts from twelve separate properties' funding records—is simply not the kind of record that is kept as a part of Wells Fargo's regular business practices.").) The

Government counters that Exhibit 1300 is machine-generated non-hearsay that compiles business records. (Gov't's Opp'n Br. to Defs.' Mot. in Limine 34-36.)

The Court generally agrees that machine-generated data is non-hearsay. "Machine-generated records usually do not qualify as 'statements' for hearsay purposes but can become hearsay when developed with human input." *United States v. Juhic*, 954 F.3d 1084, 1089 (8th Cir. 2020) (quoting *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 310-11 (2009)). The problem is that, at this juncture, the Court lacks sufficient information to determine to what extent humans inputted and collated the data contained in Exhibit 1300. In fact, as the parties' core dispute appears to center around the *collection* of the data in one exhibit (rather than the *accuracy* of the data), the Court questions whether the database entries would be better admitted as separate exhibits. *Cf. id.* ("The human involvement in this otherwise automated process makes the notations hearsay."); *United States v. Ledbetter*, No. 15-80, 2016 WL 1252982, at *5 (S.D. Ohio Mar. 31, 2016) (discussing differences between "statements of machines" and "machine-generated data that a person compiles, manipulates, or interprets" (citation omitted)). Nevertheless, should the Government wish to admit Exhibit 1300 as a business record, the Court reserves a decision on admissibility pending the context of trial.[7]

*Exhibits 1400–1404.* Next up are five exhibits, which appear to be "Consolidated Notes Log[s]" from Wells Fargo employees. On their face, the exhibits appear to be contemporaneous and date-stamped notes entered by Wells Fargo employees. Santos objects to the notes contained

---

[7] The Court also notes that whether Wells Fargo prepared Exhibit 1300 for litigation will likely be irrelevant should trial bear out that Wells Fargo kept the underlying data in the ordinary course business. *See United States v. Battles*, 514 F. App'x 242, 249 (3d Cir. 2013) ("Computer data compiled and presented in computer printouts prepared specifically for trial is admissible under Rule 803(6), even though the printouts themselves are not kept in the ordinary course of business." (quoting *United States v. Fuji*, 301 F.3d 535, 539 (7th Cir. 2002))).

in the documents as hearsay. (Santos's Mot. in Limine Br. 44-47.) The Government counters that the notes are present-sense impressions. (Gov't Opp'n Br. to Defs.' Mot. in Limine 41.)

The Court concludes that the notes are hearsay. To avail itself of the present-sense impression exception to hearsay, the Government must meet a three-pong test: "(1) the declarant must have personally perceived the event described; (2) the declaration must be an explanation or description of the event rather than a narration; and (3) the declaration and the event described must be contemporaneous." *United States v. Mitchell*, 145 F.3d 572, 576 (3d Cir. 1998). Having reviewed the exhibits, the Court finds that many of the entries appear to restate what the loan servicers were told rather than what they personally perceived. *See United States v. McNeil*, No. 04-514, 2006 WL 2000519, at *4 (D.N.J. July 17, 2006) (concluding that present-sense-impression exception was inapplicable where "declaration [wa]s more of a narration of what the declarants were told instead of an explanation of an event the declarants were observing themselves"); *AAMCO Transmissions, Inc. v. Baker*, 591 F. Supp. 2d 788, 795 (E.D. Pa. 2008) (finding shoppers' statements qualify as narrations where they "narrate their activity . . . including conversations" and "do not explain or describe an event they observed"). As the Government does not offer any other hearsay exception, the Court precludes the Government from introducing these exhibits.

*    *    *

Putting it all together, the Court concludes as follows:

- Subject to further objection at trial, the Court preliminarily admits as authenticated business records the following Government exhibits: 100 (redacted), 101–115, 200 (redacted), 201–213, 300 (redacted) 301–314, 400 (redacted) 401–414, 500 (redacted) 501–514, 600–614, 700–713, 800–803, 804 (redacted), 805–813, 900–913, 1000–1013, 1100 (redacted), 1101 (redacted), 1102–1113, 1200 (redacted), 1201–1208, 1209 (redacted), 1210–1215, 1700–1709, 1801–1810, 2100, 2300–2301, 2400–2411, 2500–2516, and 2801–2802.

- The Court reserves its decision on admissibility for the following Government exhibits: 415, 814, and 1300.

- The Court finds as inadmissible hearsay the following Government exhibits: 1400–1404.

**Motion *in Limine* #4 (Corporate Records)**: The Government next moves for a ruling that Exhibits 3700–3710 and 4101–4102 are admissible as self-authenticating public records under Rules 902(1), 902(4), and 803(8). (Gov't Mot. in Limine Br. 23-24.) Santos does not oppose this motion. (Santos's Opp'n Br. to Gov't's Mot. in Limine 17.) Simoes also does not oppose this motion. (Simoes's Opp'n Br. to Gov't's Mot. in Limine 11.) Accordingly, the Court grants this unopposed motion. Subject to further objection at trial, the Court preliminarily admits as authenticated public records Exhibits 3700–3710 and 4101–4102.

**Motion *in Limine* #5 (Summary Charts)**: The Government next moves for the admission of fourteen summary charts under Rules 1006 and 611(a). (Gov't Mot. in Limine Br. 24; Gov't Mot. in Limine Reply Br. 16.) It argues that the underlying records are admissible, that the underlying records are voluminous, that the charts are accurate, that Santos and Simoes reviewed the charts, and that a witness can testify to the charts' accuracy. (Gov't Mot. in Limine Br. at 24-26.) Santos does not oppose the Government's motion. (Santos's Opp'n Br. to Gov't's Mot. in Limine 18.) Simoes opposes, arguing that underlying business records are inadmissible, that the underlying records are not voluminous, and that the charts contain "impermissible annotations and analysis." (Simoes's Opp'n Br. to Gov't's Mot. in Limine 11-13.)

The Court admits these summary charts under Rule 1006. Under that Rule, parties may use summary charts to "prove the content of voluminous writings, recordings, or photographs that cannot be conveniently examined in court." Fed. R. Evid. 1006. The Rule requires "that in-court examination [of the underlying records] would be an inconvenience" and not that "it be literally impossible to examine all the underlying records." *United States v. Onque*, 169 F. Supp. 3d 555, 574 (D.N.J. 2015) (citation omitted), *aff'd*, 665 F. App'x 189, 198-99 (3d Cir. 2016). Indeed, where the "underlying files [are] admissible" and "the summary is accurate," the summary charts are

15

admissible. *United States v. Manamela*, 463 F. App'x 127, 132 (3d Cir. 2012); *United States v. Malik*, 424 F. App'x 122, 128 (3d Cir. 2011).

At this stage, the Court is satisfied that the underlying evidence is sufficiently accurate and voluminous to preliminarily admit the Government's summary charts under Rule 1006. This case is complicated and involves at least nine different residential transactions—each involving up to hundreds of pages of bank account records. (*See* Gov't's Mot. in Limine Br. 26 (noting that each summary chart summarizes "hundreds of pages of bank account records").) The Court has ruled on many of the underlying bank records—preliminarily admitting several of them.[8] Also (and tellingly), other courts dealing with similarly complex transactions have admitted summary charts. *See Onque*, 169 F. Supp. 3d at 562, 574 (admitting summary charts in case where "[t]he Indictment alleged that Defendants intentionally conspired and agreed with others to devise a mortgage fraud scheme and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises" and "[t]he underlying documents . . . included HUD-1 statements, closing documents, wire receipts, photographs, checks, bank statements, and loan applications for each property" that "numbered in the thousands of pages"); *United States v. Rowinsky*, No. 12-20157, 2013 WL 5607064, at *7 (S.D. Fla. Oct. 14, 2013) (denying motion seeking to preclude summary charts because "not admitting the summary charts would be the equivalent of sending the jury on a scavenger hunt to find evidence of the very transactions that are allegedly at issue in this case").[9]

---

[8] To the extent the Government's summary charts rely on exhibits the Court has deemed inadmissible, the Government shall omit any information stemming from those exhibits from the summary charts.

[9] Simoes also argues that the Government's summary charts "do[] not accurately reflect the bank records at issue and are likely to mislead the jury." (Simoes's Mot. in Limine Br. *4.) Simoes, however, does not provide specific examples of inaccuracies or misleading information on the charts. To the extent Simoes has specific objections to the accuracy of the charts or the underlying data, he should address those at trial.

**Motion *in Limine* #6 (Opinion Testimony About Wells Fargo's Lending Practices)**:
The Government next moves for a ruling that testimony of "the victim lender's underwriting, HUD-1 approval, and settlement process, including the importance to the victim lender of true and accurate loan applications, HUD-1 disclosures, and related documents" is admissible lay opinion evidence under Rule 701. (Gov't's Mot. in Limine Br. 26.) This motion is closely intertwined with the Government's first motion regarding the relevance of Wells Fargo's purported misconduct.

The Court reaches a similar conclusion and grants the Government's motion in-part. Under Rule 701, a non-expert witness may offer opinions that are "rationally based on the witness's perception," "helpful to clearly understand the witness's testimony or to determining a fact in issue," and "not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Fed. R. Evid. 701. The Court concludes that evidence from former and current Wells Fargo employees on Wells Fargo's underwriting, HUD-1 approval, and settlement process is admissible opinion testimony under Rule 701. *See United States v. Kerley*, 784 F.3d 327, 339 (6th Cir. 2015) (affirming district court that allowed "knowledge of underwriting guidelines and policies [the witnesses] acquired and applied through their respective employment" as Rule 701 testimony). That testimony is necessary for the Government to establish the necessary context of the alleged conspiracy and bank fraud. As stated above, however, the Court excludes as irrelevant and prejudicial any testimony or hypotheticals about what information former or current Wells Fargo employees would have viewed as material in their capacity as Wells Fargo employees.[10] *See Reynolds*, 189 F.3d at 525 ("A statement is material if it would be capable of influencing the decisionmaker's decision; . . . there is no requirement that the statement must in fact influence the decision-maker (that would be reliance).")). If allowed, that testimony would mislead the jury into

---

[10] The Court does not address now whether current or former Wells Fargo employees could qualify as experts on industry practices under Rule 702.

believing that Wells Fargo's subjective evaluation of the fraudulent statements is relevant; it is not. Accordingly, it grants in-part and denies in-part the Government's motion.[11]

**Motion** *in Limine* **#7 (Opinion Testimony About Santos's and Simoes's Signatures)**: The Government next moves for a ruling that lay witnesses may opine on the authenticity of Santos's and Simoes's signatures. (Gov't's Mot. in Limine Br. 30-31.) Santos does not oppose this motion. (Santos's Opp'n Br. to Gov't Mot. in Limine 18.) Simoes opposes "[b]ecause the Government has not provided . . . information for the potential witness to identify [his] handwriting." (Simoes's Opp'n Br. to Gov't's Mot. in Limine 16-17.) The Court grants the unopposed motion with respect to lay opinion testimony about Santos's signature; it reserves for trial the opposed motion with respect to Simoes's signature.

**Motion** *in Limine* **#8 (Leave to File Additional Motions)**: The Government finally moves for leave to file additional motions. (Gov't's Mot. in Limine Br. 35.) Given the proximity to trial, the Court denies this motion absent motions filed for good cause.

### B.    Santos's Motions *in Limine*

Next up is Santos's motions *in limine*. Only two remain after considering similar motions *in limine* from the Government: (1) whether to preclude four categories of prior bad acts under Rule 404(b) and (2) whether to preclude evidence of three properties not identified in the Indictment. The Court considers each in turn.

---

[11] The Court further rejects the Government's reliance on *United States v. Casher*. There, the court concluded that if the Government introduced evidence of a specific lender's actual reliance, that evidence would not be highly prejudicial to the defendant because "it does not . . . reduce the number of elements the Government must prove." 2020 WL 2557849, at *3. The court also reasoned that "actual reliance can be highly probative of whether the allegedly false statements were material." *Id.* The Court respectfully disagrees with the *Casher* Court's analysis. As stated above, materiality is an objective standard that is not the same as reliance. Further, as the Ninth Circuit has counseled, "a prophylactic rule against *all evidence of individual lender behavior* best avoids" concerns that juries might "consider whether the victims themselves relied on the defendant's false statements." *Lindsey*, 850 F.3d at 1018 (emphasis added).

**Motion *in Limine* #1 (Prior Bad Acts)**: Santos first moves to preclude four categories of evidence under Rule 404(b): (1) "political connections and purported bribes"; (2) "unrepaid loans and debts"; (3) "issues with the Internal Revenue Service"; and (4) "alleged intimidation and insinuation of connections with the Italian Mafia." (Santos's Mot. in Limine Br. 4.) The Government partially opposed the second category (unrepaid loans) and fully opposed the third category (IRS issues). (*See* Gov't's Opp'n to Defs.' Mot. in Limine 14-25, 33.) On reply, Santos withdrew his motion regarding IRS issues. (Santos's Mot. in Limine Reply Br. 11, ECF No. 219.) Adding it all up, the Court considers whether to exclude certain of Santos's unrepaid loans and debts under Rule 404(b).

On closer inspection, however, the parties appear to agree on this remaining category. Santos appears primarily concerned with the Government portraying him as a "'deadbeat,' in an effort to obtain a conviction based upon purportedly bad character." (Santos's Mot. in Limine Br. 4.) In its opposition, the Government proffers that it "does not intend to present evidence that [Santos] is a 'deadbeat,' or even if he repaid the loans." (Gov't's Opp'n Br. to Defs.' Mot. in Limine 15-16.) Santos confirms in his Reply Brief that the parties "seem . . . to have reached an accord on this issue." (Santos's Mot. in Limine Reply Br. 11.) As the parties appear to agree, the Court denies Santos's motion as moot.

**Motion *in Limine* #2 (172 Scheerer Avenue, 25 Governor Street, and 29 Bragaw Avenue)**: Santos next moves to exclude under Rule 403 evidence related to three properties not identified in the Indictment. (Santos's Mot. in Limine Br. 17-21.) Santos argues that evidence of these properties is cumulative, unnecessary, and prejudicial as mini-trials on each property will ensue. (*Id.*) The Government counters that these properties fall well within the scope of the conspiracy count in the Indictment, that the evidence is highly probative, and that the presentation

of this evidence will not substantially lengthen trial. (Gov't's Opp'n Br. to Defs.' Mot. in Limine 6-14.)

Here, the Court agrees with Santos that evidence of these properties is cumulative and unnecessary under Rule 403. That Rule provides that "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by . . . undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. The Indictment specifically lists nine properties that are relevant to the single conspiracy count and the eighteen counts of bank fraud and false statements. So, evidence of these nine properties is already probative of all the counts. Nevertheless, as the Government's briefing makes clear, it has substantial evidence in store for these three additional properties, including summary charts, three different witnesses, and documentary evidence for each property. (*See* Gov't's Opp'n Br. to Defs.' Mot. in Limine 12-13.) But the Government also notes that the allegations for these three properties "follow the same basic pattern as the other nine." (*Id.* at 10.) Taken together, these representations suggest that the Government will spend substantial trial time putting on evidence of these three properties even though evidence about the other nine properties seems to suffice to prove the conspiracy count. *But see In re Paoli R.R. Yard Litig.*, 35 F.3d 717, 783 (3d Cir. 1994) (affirming district court that excluded "minimal[ly] relevan[t]" evidence because that evidence "would create the need to have mini-trials" and "would cause 'undue delay' given the minimal relevance of the evidence").

Considering these representations, the Court concludes that evidence related to these three properties is inadmissible as cumulative and time-wasting under Rule 403. Simply put, the Government does not need evidence of three additional properties in a complex case already involving nine properties. From what the Court can glean, these three properties present the same type of evidence as the other nine. (*See, e.g.*, Gov't's Opp'n Br. to Defs.' Mot. in Limine 12 (noting that Santos recruited a straw buyer for 25 Governor Street); *id.* at 13 (noting that Simoes submitted

false documents to the lender relating to 172 Scheerer Avenue and 29 Bragaw Avenue).) Nor does the Government proffer what makes these three properties essential to proving the conspiracy. (*See id.* at 12-14.) Also of concern, these three properties are relevant only to the conspiracy count thereby risking confusing the jury regarding the other eighteen counts. On the flip side, minimal jury confusion occurs if the Court limits this case to the nine properties identified in the Indictment. Thus, in the absence of any special reason to include these properties in the trial, the Court preliminarily excludes this evidence.

### C.    Simoes's Motions *in Limine*

Simoes also moves *in limine*. Like Santos's motions, only two of Simoes's remain after considering similar motions *in limine* from the Government: (1) whether to preclude prior bad acts under Rule 404(b) and (2) whether to preclude speculative and bad-faith evidence. The Court considers each in turn.

**Motion *in Limine* #1 (Prior Bad Acts)**: Simoes moves to exclude any evidence of "client complaints, fee arbitration requests, or civil suit allegations instituted against" him under Rule 404(b). (Simoes's Mot. in Limine Br. *3, ECF No. 202-1.)[12] The Government proffers that it does not anticipate introducing this Rule 404(b) evidence during trial. (Gov't's Opp'n Br. to Defs.' Mots. In Limine 42-43.) Accordingly, the Court denies Simoes's motion as moot.

**Motion *in Limine* #2 (Bad-Faith Evidence)**: Simoes moves to exclude "any evidence that is speculative and lacks a 'good faith basis.'" (Simoes's Mot. in Limine Br. *4 (capitalization omitted).) Simoes does not specify which evidence his motion applies to—for example, he argues that the Government will "use certain summaries of bank records" which "us[e] an unknown methodology" to explain that he "advanced funds before the settlement or closing of certain mortgage transactions." (*Id.*) As a solution, Simoes proposes that the Government proffer a

---

[12] Pin-cites preceded by asterisks indicate the pagination atop the CM/ECF header.

good-faith basis at sidebar before introducing any of this speculative evidence. (*Id.*) Simoes cites no law for this proposition, and the Court declines to endeavor on this evidentiary journey with him. It accordingly denies without prejudice this motion.

### D.    Simoes's Motion to Dismiss

The Court next considers Simoes's Motion to Dismiss.

#### 1.    *Relevant Background*

This motion arises out of the Government's decision to not indict Raquel Casalinho as part of the charged conspiracy. (Simoes's Mot. to Dismiss Br. 2, ECF No. 208-1.) The criminal complaint named Santos, Simoes, Arsenio Santos, and Casalinho and alleged, among other things, that Santos directed Casalinho to help prepare fraudulent mortgage loan applications. (*See* Compl. ¶ 9, ECF No. 1.) The subsequent Indictment did not name Casalinho and was subsequently returned by a grand jury. Following that return, the Government dismissed the criminal complaint against Casalinho. To that end, the Government avers that it twice proffered Casalinho and decided not to indict her so as "to continue its investigation of [her] to develop further evidence of the alleged conspiracy." (Gov't's Opp'n Br. to Simoes's Mot. to Dismiss 4, ECF No. 213.)

#### 2.    *The Government Did Not Engage in Prosecutorial Misconduct.*

Simoes makes two arguments for why this case should be dismissed. *First*, he argues that, by dropping charges against Casalinho, the Government "made a tactical decision to remove her from the case to prevent the defense from raising any evidence of misconduct by specific Wells Fargo employees." (Simoes's Mot. to Dismiss Br. 4.) *Second*, he argues that the Government engaged in prosecutorial misconduct by refusing to offer Casalinho immunity such that she could not be called as a defense witness. (*Id.* at 4-6.)

The Court rejects both arguments. Critically, Simoes must show that the prosecutorial misconduct will "infect[] the trial with unfairness" tantamount to "a denial of due process."

*Marshall*, 307 F.3d at 64. Indeed, courts counsel that those bringing prosecutorial-misconduct claims face a "substantial burden" of showing "that the government's decisions were made with the deliberate intention of distorting the judicial factfinding process." *United States v. Yu Xue*, No. 16-22, 2018 WL 3647900, at *6 (E.D. Pa. Aug. 1, 2018) (second quoting *United States v. Herman*, 589 F.2d 1191, 1204 (3d Cir. 1978)). Simoes cannot make that showing. As to the first argument, as the Court has already stated, evidence of misconduct by Wells Fargo is not a defense to bank fraud. *See, e.g.*, *Coyle*, 63 F.3d at 1244 ("The negligence of the victim in failing to discover a fraudulent scheme is not a defense to criminal conduct."); *United States v. Kreimer*, 609 F.2d 126, 132 (5th Cir. 1980) ("The victim's negligence is not a defense to criminal conduct."); *United States v. Allen*, 201 F.3d 163, 167 (2d Cir. 2000) (per curiam) ("The victim's negligence in permitting a crime to take place does not excuse the defendant from culpability for [the] substantive offense . . . ."); *United States v. Colton*, 231 F.3d 890, 903 (4th Cir. 2000) ("The susceptibility of the victim of the fraud, in this case a financial institution, is irrelevant to the analysis: If a scheme to defraud has been or is intended to be devised, it makes no difference whether the persons the schemers intended to defraud are gullible or skeptical, dull or bright." (internal quotation marks and citations omitted)); *United States v. Svete*, 556 F.3d 1157, 1165 (11th Cir. 2009) (en banc) ("A perpetrator of fraud is no less guilty of fraud because his victim is also guilty of negligence."). Thus, a bank-fraud trial without the defense of lender misconduct is not unfair.

As to Simoes's second argument, the Court concludes that refusing to offer Casalinho immunity will not result in an unfair trial. The parties agree that a five-part test governs refusal-to-immunize claims: "[1] [I]mmunity must be properly sought in the district court; [2] the defense witness must be available to testify; [3] the proffered testimony must be clearly exculpatory; [4] the testimony must be essential; and [5] there must be no strong governmental interests which countervail against a grant of immunity." *United States v. Quinn*, 728 F.3d 243, 262 (3d Cir. 2013)

(alterations in original) (quoting *Gov't of Virgin Islands v. Smith*, 615 F.2d 964, 972 (3d Cir. 1980)). Here, the Court has little doubt that the testimony of Casalinho would not be clearly exculpatory. The Third Circuit has set a high bar for what constitutes clearly exculpatory testimony: "[t]estimony that is at best speculative, severely impeached by the witness's prior inconsistent statement(s), ambiguous on its face, or even if believed, would not in itself exonerate the defendant, is not clearly exculpatory." *Id.* (alteration, quotation marks, and citations omitted). Simoes proffers that Casalinho would testify as to her "intentional falsification of loan applications." (Simoes's Mot. to Dismiss Br. 6.) But that testimony is not exculpatory because it is not a defense to bank fraud. Further, even if the testimony was admissible and the jury believed it, Simoes does not explain how this testimony would *clearly* exculpate him. *See United States v. Gibson*, No. 16-46, 2020 WL 2849988, at *5-7 (D. Del. June 2, 2020) (denying refusal-to-immunize claim where testimony was exculpatory but "not 100 percent exonerating by itself" and where defendant did not explain how testimony defeated inculpatory evidence). At best, the testimony is ambiguous and speculative.

E.    **Simoes's Motion to Release *Brady* Materials**

Simoes's final motion requests that the Government produce as exculpatory evidence any "[i]nformation related to the Government's decision not to prosecute Wells Fargo and its employees for their participation in the alleged scheme." (Simoes's *Brady* Mot. Br. 2, ECF No. 212-1.) This motion is derivative of Simoes's motion to dismiss. Both assume (wrongly) that the lender's misconduct is relevant to Simoes's defense. It is not.[13]

---

[13] Simoes also requests, and the Government does not oppose, that the Court enter an order under Rule 5(f). The Court will do so without any prejudice accruing to the Government.

IV.     **CONCLUSION**

The Court will issue an order consistent with this Memorandum Opinion.

MICHAEL A. SHIPP
UNITED STATES DISTRICT JUDGE